COMAC PARTNERS, L.P., Comac Endowment Fund, L.P., Comac Opportunities Fund, L.P., Comac International, N.V., Carl Marks Strategic Investments, LP, Carl Marks Strategic Investments II, LP, Varde Partners, L.P., the Varde Fund (Cayman) Ltd., Pequod Investments, L.P., Pequod International Ltd., Cerberus Partners L.P. and Ceberus International Ltd., Plaintiffs,

v.

John J. GHAZNAVI, Richard M Deneau, Roger L. Erb, David T. Gutowski, C. Kent May, Ahmad Ghaznavi, Andrew M. Boas, Patrick T. Connelly, Paul J. Coughlin, III, Eugene I. Davis, Paul H. Ferrar, Steven J. Friesen, Jonathan K. Hergert, M. William Lightner, Jr., Irwin Nathanson, Robert C. Ruocco, and Christopher M. Mackey, Defendants,

and

Anchor Glass Container Corporation, Nominal Defendants.

Civil Action No. 18971.

Court of Chancery of Delaware, New Castle County.

Submitted: Oct. 19, 2001.
Decided: Oct. 25, 2001.
Revised: Oct. 30, 2001.

Martin P. Tully and Matt Neiderman, Esquires, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Of Counsel: Theodore Gewertz, Esquire, of Wachtell, Lipton, Rosen & Katz, New York, New York, Attorneys for Plaintiffs.

Stephen C. Norman, Kevin R Shannon, and Brian C. Ralston, Esquires, of Potter Anderson & Corroon, Wilmington, Delaware; Of Counsel: John M. Newman, Jr., Richard I. Werder, Jr., Edward J. Sebold, Esquires, of Jones, Day, Reavis & Pogue, Cleveland, Ohio, Attorneys for Defendant Anchor Glass Container Corporation.

Samuel A. Nolen and Dominick T. Gattuso, Esquires, of Richards, Layton & Finger, Wilmington, Delaware, Attorneys for Defendants John J. Ghaznavi, Richard M. Deneau, Roger L. Erb, David T. Gutowski, C. Kent May, Ahmad Ghaznavi, Andrew M. Boas, Patrick T. Connelly, Paul J. Coughlin, III, Eugene I. Davis, Paul H. Farrar, Steven J. Friesen, Jonathan K. Hergert, M. William Lightner, Jr., Irwin Nathanson, Robert C. Ruocco, and Christopher M. Mackey.

## OPINION

STRINE, Vice Chancellor.

Defendant Anchor Glass Container Corporation has not held an annual meeting of its stockholders for over four years. As such, it is undisputed that Anchor must hold an annual meeting, as the plaintiffs have requested in this action pursuant to 8 *Del. C.* $211 and § 225. The question that remains hotly disputed is whether all the seats on Anchor's board of directors will be open for election at the meeting, or whether a minority of the board seats are

up for grabs.[1]

In this opinion, I conclude that all of the seats on the Anchor board are up for election at the next annual meeting. This conclusion best comports with the relevant provisions of Anchor's certificate of incorporation and bylaws, as well as the Delaware General Corporation Law ("DGCL"). Therefore, I grant plaintiffs' motion for summary judgment.

## I. *Factual Background* [2]

### A. *The Relevant Provisions Of Anchor's Governing Instruments*

Anchor was formed as a Delaware corporation in 1997. Its original certificate of incorporation was filed on January 3, 1997. The original certificate provided for nine "Initial Directors" to serve during an "Initial Period," which was to expire on December 18, 1999.[3]

On February 5, 1997, Anchor filed an amended and restated certificate of incorporation (the "Restated Certificate"). The Restated Certificate provided that Anchor would have three classes of common stock during the Initial Period, Classes A–C. During that Period, the Class A stockholders had the right to elect four members of the Anchor board, and the Class B stockholders had the right to elect the other five. The Class C stockholders had no voting rights. On June 11, 1998, the Restated Certificate was amended yet again,[4] to increase the number of directors during the Initial Period to eleven and extend the Initial Period to February 5, 2000. The two additional directors were to be elected by the Class B holders, thus giving them the right to elect seven of the eleven board members. The amendment also provided that Classes A, B, and C of Anchor's stock would be converted into a single class of common stock upon the expiration of the Initial Period.

The Restated Certificate also sets forth the process by which the board of directors is to be determined at the end of the Initial Period. In pertinent part, § 7.2(b) of the Restated Certificate provides:

> Upon the expiration of the Initial Period, the Board of Directors shall determine the number of directors which shall thereafter constitute the Board of Directors. Such number of directors shall then be divided into three classes ("Classes"), which shall be as nearly equal in number as possible. The term of office of the first Class of directors shall expire at the first annual meeting after their election; the term of office of the second Class of directors shall expire at the second annual meeting after their election; and the term of office of the third Class of directors shall expire at the third annual meeting after their election. At each annual meeting, the number of directors equal to the Class whose term has expired at the time of such meeting shall be elected to hold office until the third succeeding annual meeting.[5]

The composition of the Anchor board is also influenced by the rights of the compa-

---

1. Those Anchor directors who support the company's position have joined the case as defendants. They have embraced the company's position and I do not refer to them again.

2. The facts are largely undisputed.

3. In the original certificate, the expiration date was later. A January 21, 1997 Certifi-

cate of Correction changed the date to that indicated above.

4. The plaintiffs contend that there is no proof that this amendment received the necessary stockholder approval.

5. Restated Certificate, § 7.2(b).

ny's preferred stock. Pursuant to an amended Certificate of Designation, the Series A Preferred stockholders of Anchor have the right to elect five directors when the company has failed to pay dividends for a period defined in the Certificate.[6]

### B. The Composition Of The Anchor Board At The End Of The Initial Period

When the Initial Period ended on February 5, 2000, the Anchor board was comprised of eleven directors (the "Holdover Board" or "Holdover Directors").

The following "Class B Holdover Directors" were elected through written consent by the Class B common stockholders: John J. Ghaznavi, David T. Gutowski, M. William Lightner, C. Kent May, Paul H. Farrar, Richard Deneau, and Steven Friesen. The Class B common stock was held by Consumers U.S. Inc. and others affiliated with John J. Ghaznavi, who is indirectly Consumer U.S.'s controlling stockholder and was then Anchor's Chairman of the Board and Chief Executive Officer.

The Class A common stockholders had elected, by written consent, the following "Class A Holdover Directors": Robert Ruocco, Christopher Mackey, William J. Shaw, and Myron Sheinfeld. The plaintiffs in this case owned Class A common stock before the expiration of the Initial Period.

### C. The Holdover Board's Decisions Regarding The First Classified Board

On March 8, 2000, the Holdover Board as then composed met. Among the issues that were on the table was the size and classification of the board in the wake of

the Initial Period's expiration. According to the minutes of the meeting, the following action was taken:

WHEREAS, Section 7.2(b) of the Amended and Restated Certificate of Incorporation (the "Certificate") of Anchor Glass Container Corporation, a Delaware corporation (the "Corporation"), provides, among other things, that:

(a) from and after the expiration of the Initial Period (i.e., February 5, 2000), the number of directors and the manner of their election, removal and the filling of vacancies are to be in accordance with the Corporation's Bylaws, subject to the requirements of Section 7.2(b) and Section 7.3 of the Certificate;

(b) upon the expiration of the Initial Period, the Board of Directors of the Corporation shall determine the number of directors which shall thereafter constitute the Board of Directors; and

(c) such number of directors shall then be divided into three classes (individually a "Class" and collectively, "Classes"), which shall be as nearly equal in number as possible; and

(d) the term of office of the first Class of directors shall expire at the first annual meeting after their election and the term of office of the second Class of directors shall expire at the second annual meeting after their election and the term of office of the third Class of directors shall expire at the third annual meeting after their election.

WHEREAS, Section 3.4 of the Corporation's Bylaws provides that, subject to the rights of the holders of any series of Preferred Stock to elect additional directors under circumstances specified in a Preferred Stock Designation, and ex-

---

**6.** Series A Preferred Cert. of Desig., § 6(b). Another provision gives the Series B Preferred stockholders a similar right. Accord-

ing to the parties, the Series B Preferred's right to elect directors has not been triggered.

cept as provided in the Certificate of Incorporation, a vacancy on the Board of Directors, however occurring, whether by increase in the number of directors, death, resignation, retirement, disqualification, removal from office or otherwise, may be filled, until the next election of directors by the stockholders, by the affirmative vote of a majority of the directors then remaining in office, though they may constitute less than a quorum, or by a sole remaining director.

NOW, THEREFORE, BE IT RESOLVED, that subject to the rights of the holders of any series of Preferred Stock to elect additional directors under circumstances specified in a Preferred Stock Designation, the number of directors which shall hereafter constitute the Corporation's Board of Directors is hereby increased by four from eleven to fifteen.

RESOLVED, FURTHER, that the vacancies on the Corporation's Board of Directors occurring by reason of such increase are hereby filled by the following individuals who shall serve until their successors are elected and have qualified or until their earlier resignation or removal:

Ahmad Ghaznavi;

Patrick Connelly;

Roger Erb; and

Jonathan K. Hergert.

RESOLVED, FURTHER, that the Corporation's Board of Directors is hereby divided into the following three Classes:

(i) Robert Ruocco, Christopher Mackey, William J. Shaw, Myron Sheinfeld and C. Kent May (the "Class One Directors");

(ii) Ahmad Ghaznavi, Patrick Connelly, Roger Erb, David T. Gutowski and M. William Lightner (the "Class Two Directors");

(iii) John J. Ghaznavi, Richard Deneau, Paul Farrar, Steven Friesen, and Jonathan IS. Hergert (the "Class Three Directors")

RESOLVED, FURTHER, that the term of office of the Class One Directors shall expire at the first annual meeting of the Corporation's stockholders to be held after the date hereof; the term of office of the Class Two Directors shall expire at the second annual meeting of the corporation's stockholders to be held after the date hereof; and the term of office of the Class Three Directors shall expire at the third annual meeting of the Corporation's stockholders to be held after the date hereof.[7]

In summary, the minutes indicate that the board: (1) increased its size to fifteen; (2) picked four directors to fill the four seats created by the expansion (the "Expansion Directors"); (3) placed the fifteen board members into three classes; and (4) purported to adopt a resolution whereby each of the fifteen members would serve one-, two-, or three-year terms beginning at the board meeting and ending at the annual meeting one, two, or three years thereafter respectively. It is the last aspect of the Holdover Board's action (the "March 8 Resolution") which is now contested.

## II. *The Core Arguments Of The Parties*

According to defendant Anchor, the board validly elected fifteen directors on March 8, 2000. Thus, Anchor says, the Class One directors were elected to one-year terms that were to expire at the company's 2001 annual meeting; the Class Two directors were elected to two-year terms to expire at the company's 2002

---

[7.] Minutes, Anchor Board of Directors Meeting, Mar. 8, 2000.

annual meeting; and the Class Three directors were elected to three-year terms to expire at the company's 2003 annual meeting. The plain language of the March 8 Resolution makes this intent clear, Anchor argues, because it indicates that the directors terms expire on a staggered basis at various annual meetings "to be held after the date hereof" [i.e., the March 8, 2000 board meeting].[8] In addition, Anchor notes that the board unanimously approved the March 8 Resolution, thus evidencing that the Class A Holdover Directors supported the Resolution and understood that they were electing the fifteen directors who would constitute the first board after the end of the Initial Period (the "First Classified Board").

The plaintiffs contend that even if it was the Holdover Board's intention to conduct an election on March 8, 2000, electing the First Classified Board by Holdover Board Action was contrary to § 7.2(b) of the Restated Certificate, which indicates only that the Board had the power to "determine the number of directors" to constitute the First Classified Board after the end of the Initial Period and to "divide such number" into three classes. Thus, they argue that the only power conferred upon the Anchor board in connection with the creation of the First Classified Board was the authority to determine the number of directors who would comprise that board and to divide that number as nearly as possible into three equal parts. The clear contemplation of the Restated Certificate, they assert, was that the Anchor stockholders would have the opportunity to elect the entire First Classified Board once the Holdover Board performed these limited tasks. The directors elected by the stockholders would then serve one-, two-, or three-year terms (depending on class) until the relevant annual meeting following the date of their election.

The plaintiffs further argue that even if the Class A Holdover Directors voted for the March 8 Resolution, former Class A common stockholders cannot be estopped from bringing this case simply because directors they elected acquiesced in an action at odds with the company's Restated Certificate. Moreover, they assert, the directors elected by the Class A stockholders did not vote to approve the minutes of the March 8, 2000 board meeting.

Based on these contending positions, the plaintiffs and defendant Anchor have different views as to how many directors are up for election at the 2001 annual meeting. Anchor contends that only the five Class One directors should be on the ballot. By contrast, the plaintiffs argue that all fifteen board seats which make up Classes One, Two, and Three are up for grabs because none of the directors were validly elected after the expiration of the Initial Period.

These core arguments are common to all of the fifteen persons who putatively serve as directors of Classes One, Two, and Three. The briefing also has surfaced in a more glancing way arguments relating to those members of the board—the Expansion Directors—who were named to the seats created when the Holdover Board decided to set the size of the First Classified Board at fifteen rather than eleven. Anchor has asserted that the four Expansion Directors are differently situated than the other eleven directors, all of whom were members of the Holdover Board. Because the Expansion Directors picked to fill the four new seats were placed in "newly created directorships," Anchor contends that those four directors hold office, per 8 Del. C. § 223(b), until their Classes are

8. Id.

next up for election. Because three of the four Expansion Directors were designated to serve in Class Two and the other was designated in Class Three, Anchor argues that they need not contest their seats at this year's annual meeting.

By contrast, the plaintiffs contend that § 3.4 of the bylaws of Anchor quite clearly state that the board may fill newly created directorships only until the next election of stockholders. Moreover, they argue that the only power conferred upon the Anchor board in connection with the creation of the First Classified Board was the authority to determine the number of directors who would comprise that board and to divide that number as nearly as possible into three equal parts. The clear contemplation of the Restated Certificate was that the Anchor stockholders would have the opportunity to elect the entire First Classified Board once the Holdover Board performed these limited tasks.

For the sake of completeness, it must be noted that the plaintiffs' demand for an annual meeting also implicates five other board seats. On March 31, 2000, the Series A Preferred stockholders became entitled to elect five directors, increasing the total size of the Anchor board to twenty. Shortly thereafter, the Series A Preferred stockholders exercised that right.

The plaintiffs contend that the Series A Preferred seats are also up for election at the 2001 annual meeting, but are to be selected only by the votes of the Series A Preferred. They base this assertion on the plain language of § 6.(b) of the Series A Certificate of Designations. Anchor did not respond to this aspect of the plaintiffs' argument, which I deem to be an admission of the correctness of the plaintiffs' position.

## III. *The Applicable Procedural Standard*

This case comes before me on cross-motions for summary judgment. For the most part, the parties are in agreement on the relevant facts, and neither has contended that discovery is necessary to develop evidence bearing on the proper interpretation of the relevant corporate instruments. In ruling on this motion, I apply the familiar Rule 56 standard, which requires me to accord every reasonable inference from the factual record to the non-moving party. Nor does the fact that parties have cross-moved for summary judgment necessarily mean that there is no genuine issue of material fact.[9]

Rather, the court must evaluate the record and apply the relevant Rule 56 standard to each motion. If after so doing, the court determines that there is no genuine issue of material fact and that one of the parties is entitled to judgment as a matter of law, summary judgment must be granted.[10]

## IV. *The Entire Anchor Board is To Be Elected At The Next Annual Meeting*

The dispute before me largely centers on issues that are common to all of the fifteen persons now putatively serving as Class One, Class Two, and Class Three directors of Anchor. In the first instance, I will therefore address the issues that affect all of these directors. Then I will address the argument that affects only the Expansion Directors, *i.e.*, the four persons selected to fill the four seats created when the board set the size of the First Classified Board at fifteen.

9. *United Vanguard Fund, Inc. v. TakeCare, Inc.*, Del.Supr., 693 A.2d 1076, 1079 (1997).

10. *See, e.g., Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131 (1990).

### A. *All Of The Holdover Directors Must Stand For Re–Election At This Year's Meeting*

The central issue before the court requires me to interpret § 7.2(b) of Anchor's Restated Certificate. Anchor contends that § *7.2(b) implicitly* empowered the Holdover Board to "elect" the company's First Classified Board at the end of the Initial Period. It contends that the sitting directors exercised this power on March 8, 2000 to validly elect a fifteen-person board comprised of three classes of directors serving one-, two-, and three-year terms.

Anchor is, of course, unable to point to any language in § 7.2(b) that says that the First Classified Board would be "elected" by the Holdover Board sitting at the end of the Initial Period. Thus, it bases its argument on the proposition that it is obvious that the sitting directors had this power, because otherwise the purpose served by the establishment of a classified board would be undermined. Moreover, Anchor argues that it is implausible to think that the Holdover Board would be given the power to set the size of the First Classified Board and to divide that number into classes as nearly as equal as possible without also being given the authority to elect the members of the First Classified Board. Finally, Anchor argues that its interpretation is bolstered by the alleged approval of the March 8 Resolution by the Holdover Directors elected by the Class A common stockholders. This approval is said to be evidence of "course of dealing" under § 7.2(b), which is persuasive evidence of the provision's meaning in the event of an ambiguity.

Anchor's arguments do not persuade me. They involved a strained construction of § 7.2(b), which results in the Holdover Board being able to extend their own terms without involvement by the stockholders. To assume—as Anchor does—that § 7.2(b) silently provides for a process whereby sitting directors may elect themselves to new terms of office is unreasonable.

█ In so concluding, I begin by pointing out that Anchor's construction is not at all necessary to the sensible implementation of § 7.2(b). By its plain terms, § 7.2(b) only empowers the Holdover Board to do two things at the end of the Initial Period: (1) "determine the number" of directors who will serve on the first classified board; and (2) divide "such number" of directors into three classes as nearly equal as possible. Section 7.2(b) nowhere indicates that the Holdover Board was empowered to go further and to elect the specific individuals who would serve as directors in each of the three classes on the First Classified Board.

The plausibility of Anchor's construction is also undercut by the fact that a contrary reading of § 7.2(b) fits much more naturally with the context in which the Anchor board was to become classified. Remember that at the end of the Initial Period, all the common stock of Anchor was unified in one class with equal voting rights. Thus, the Initial Period signaled the end of the preferential voting power of the Class B common stockholders. It therefore makes sense that all the common stockholders would vote together to elect the First Classified Board.

Nor does permitting the stockholders to elect the First Classified Board gut the purpose of establishing a classified board. Looking forward, the classified board structure will insulate a majority of the Anchor board from removal through the election process in any single year, so long as the board faithfully schedules annual stockholder meetings at which directors

are in fact elected to new terms.[11]

Likewise, the proposition that the stockholders would elect the First Classified Board is wholly consistent with the language of § 7.2(b). The Holdover Board's role was to set the number of the First Classified Board, and to divide that number into classes as nearly equally as possible. A stockholder election would then be held at which all the seats on the First Classified Board were up for election, and the stockholders would choose the Board. To the extent that the Holdover Board wished to propose its own management slate, it could do so and nominate its slate for elections to the various seats in the three Classes.

■ Anchor's reading of the Restated Certificate becomes even more implausible when considered in view of the applicable statutory law. It is odd to think that a sitting board of directors of an existing corporation can be empowered by a certificate provision to elect itself to new terms in the future, without further stockholder involvement. Our statutory scheme generally anticipates that the election of directors will be by the stockholders on an annual basis.[12] While the statute permits the creation of a classified board, it limits the maximum term of any director on such a board to three years.

■ It is, of course, the case that a director may holdover at the end of her term until her successor is seated. Yet, a holdover board may not elect itself to a new term; rather, the board must stand for election at the next stockholder meeting, which may be compelled under § 211 if the board itself does not schedule it.[13] It

---

11. In a recent situation, incumbent directors on a classified board who were unopposed for election failed to receive adequate votes to be re-elected in rather unusual circumstances. As a consequence, this court held that the incumbents continued to serve as holdovers, but only until the next annual meeting. *North Fork Bancorporation v. Toal*, Del. Ch., C.A. Nos. 18147 & 18165, mem. op. at 21, Lamb, V.C., 2000 WL 1721109 (Nov. 13, 2000), *aff'd*, Del.Supr., 781 A.2d 693 (2001). In so ruling, the court rejected "any suggestion that the five holdover directors should stay in office for an additional 3–year term." *Id.* Instead, their five seats would be up for election at the next annual meeting along with the five seats belonging to one of the other three classes of directors—thus enabling the stockholders an opportunity to elect a new board majority at one meeting.

12. 8 *Del. C.* §§ 141(a), 211. See *also Bentas v. Haseotes*, Del. Ch., 769 A.2d 70, 76 (2000) ("The important policy that is implicit, and underlies, these statutory provisions is that the business and affairs of a Delaware corporation must be governed by a board of directors whose members have stood for election, and who have actually been elected by the stockholders, on *an annual basis*. Only in that way can the directors' continued accountability to shareholders, and the legitima-cy of their decisions that bind the corporation's stockholders, be assured. As former Chancellor Allen has observed, the shareholder vote is '... critical to the theory that legitimates the exercise of power by some (directors or officers) over vast aggregations of property that they do not own.' ") (emphasis *in* original) *(quoting Blasius Indus., Inc. v. Atlas Corp.*, Del. Ch., 564 A.2d 651, 659 (1988)).

13. *See Rohe v. Reliance Training Network, Inc.*, Del. Ch., C.A. No. 17992, mem. op. at 26, Strine, V.C., 2000 WL 1038190 (July 21, 2000) ("Under Delaware law, a certificate of incorporation cannot specify the directors of the corporation for more than an initial period. And except in the case of a properly classified board, all directors must face the electorate on an annual basis at the corporation's annual stockholder's meeting.") *(citing, inter alia*, 8 *Del. C.* §§ 102(a)(6); 102(b)(1); 141(d); 211; *Roven v. Cotter*, Del. Ch., 547 A.2d 603, 605 (1988) ("The stockholders elect directors for a one year term, unless the certificate of incorporation or an initial bylaw, or one later adopted by the stockholders, provides for a classified board.")). *Cf. Bentas*, 769 A.2d at 76 ("Holdover directors are a "default" result, but under our scheme of governance, that default arrangement cannot

is also true that a board may "fill" a directorship when a vacancy arises or a director position is newly created.[14] But even in those events, the board-appointed directors will serve at most until the next election of the class for which the director was appointed.[15]

This statutory backdrop undermines Anchor's interpretation of § 7.2(b). The use of the term "election" in § 7.2(b) seems like an obvious reference to the need for the First Classified Board to be selected at the corporate ballot box in a competitive process by the corporation's electorate—its stockholders. And it is hard to imagine that certificate drafters with a contrary intent would proceed as the drafters of § 7.2(b) did. Anyone attempting to do something so unusual and of such doubtful validity—to invest holdover directors with the discretionary power *at a future date* to elect themselves to new terms of up to three years—would not do so in an oblique fashion that forces the reader to make the counterintuitive assumption that the word "election" refers to a power § 7.2(b) silently vests in the Holdover Board.

To buttress its view that the term "election" indeed refers to such an unusual power of the Holdover Board, Anchor relies upon 8 *Del. C.* § 141(d), which states that

The directors of any corporation organized under this chapter may, by the certificate of incorporation ... be divided into one, two or three classes; the term of office of those of the first class to expire at the annual meeting next ensuing; of the second class one year thereafter; of the third class two years thereafter; and at each annual election held after such classification and election, directors shall be chosen for a full term, as the case may be, to succeed those whose terms expire....

Anchor argues that § 141(d) is capacious enough to authorize a certificate provision that simultaneously (i) creates a classified board in the future, and (ii) vests the board members who happen to be sitting at the time the classified board is to be created with the power to elect themselves to additional terms of up to three years. Whether that is true is at best questionable. What is not questionable is that it is unreasonable to infer that § 7.2(b) of the Restated Certificate is a silent attempt to test that dubious proposition. Section 7.2(b) is not written with such clarity that the stockholders who voted to approve it would have thought it invested the Holdover Board with such an unusual grant of extraordinary elective power.[16]

be a long term substitute for an effective annual election.")).

**14.** 8 *Del. C.* § 223(a)(1).

**15.** 8 *Del. C.* § 223(b).

**16.** One could easily imagine a certificate amendment or stockholder-adopted bylaw that established a classified board of a certain number, and which was adopted by stockholders simultaneously with their election of the new classified board. *See, e.g.,* 1 R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, THE DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS, § 4.6 (Supp.1999) ("Care must be

taken in drafting the amendments to the certificate of incorporation providing for a classified board. The amendment must expressly provide the method of implementation by setting forth precisely the procedure applicable to the various classes. Provision must also be made for the election of directors to fill the staggered terms if the election is to be the same meeting at which the amendment is adopted authorizing the staggered board."). One could, I suppose, even imagine a certificate amendment or stockholder-adopted bylaw which specifically stated the persons who were to be elected as the first classified board simultaneous with the creation of the classified board system. In either of these situations, the stockholders would have in fact

But Anchor argues that there is persuasive evidence that the drafters of § 7.2(a) in fact proceeded in such an indirect fashion: the Holdover Board unanimously approved the March 8 Resolution that established the First Classified Board and that supposedly elected the Holdover Board to new terms. But the record evidence about the March 8, 2000 board meeting is sketchy at best, and the Class A Holdover Directors dissented from the approval of the relevant meeting minutes. From the record before me, I have no idea whether the purpose and effect of the Resolution was explained to the board by legal counsel. Indeed, there is no evidence that the Holdover Board was presented with a written resolution on March 8. The March 8 Resolution in the record was prepared some time *after* the meeting. As important, Anchor has made no effort to present evidence regarding the intent of the Anchor board at the time § 7.2(b) was proposed, or the understanding the Anchor stockholders had when they adopted it.

■ Whether or not the entire Holdover Board believed itself three years later to possess the power to elect itself to new terms by virtue of $7.2(b), that interpretation is an unreasonable one that is not binding on the Anchor electorate. The Anchor stockholders are entitled to have the Restated Certificate enforced as written. The proposition that the Holdover Board was empowered to re-elect itself finds no reasonable support in text of the Restated Certificate. And any ambiguity in the Restated Certificate should be resolved in favor of the construction that permits a majority of the Anchor stockholders to elect the First Classified Board.[17]

■ Likewise, I conclude the Anchor stockholders are not bound generally as a class by the alleged acquiescence of the Class A Holdover Directors in the March 8 Resolution. Anchor has made no attempt to show that *all* the plaintiff stockholders have such a strong relationship (e.g., principal-agent, employer-employee) to the Class A Holdover Directors that none of them may press the claim now before me. The mere fact that the plaintiffs may have voted for the Class A Holdover Directors does not mean that they are estopped from challenging any decision supported by those Directors.[18] Moreover, the company

"elected" the new classified board concurrent with the creation of the classified board system. By contrast, the certificate provisions at issue here indicated that a classified board would be created in the future, and charged the board with explicit duties to implement that mandate. Anchor contends that the board's explicit obligations in connection with the creation of the classified board were also accompanied by the implicit power to elect the First Classified Board; that is, it argues that the stockholders' adoption of certificate amendments in 1997 and 1998 tacitly delegated the authority to elect the First Classified Board to the directors serving at the end of the Initial Period in 2000.

**17.** *See Rainbow Navigation, Inc. v. Yonge*, Del. Ch., C.A. No. 9432, mem. op. at 10, 1989 WL 40805, *5, 1989 Del. Ch. LEXIS 41 at *12, Allen, C. (Apr. 24, 1989).

**18.** *In Speiser v. Baker*, Del. Ch., 525 A.2d 1001 (1987), this court held that a stockholder and director could challenge the corporation's failure to hold an annual meeting, even though he had acquiesced in (i) the failure of the corporation to hold an annual meeting for several years; and (ii) the creation of a quorum requirement that gave himself and another stockholder the power to thwart the convening of a meeting. Recognizing the statute's mandate for an annual meeting, the court stated:

> [I]t would require a powerful equity for this court to fail to act when a shareholder satisfies the statutory elements of a claim under Section 21 1(c). Mere acquiescence in the failure to hold earlier meetings, or indeed connivance to avoid earlier meetings, ought not, in my opinion, deprive shareholders generally of the right to elect directors at an annual meeting.

has other common stockholders not affiliated with the plaintiffs, who are entitled to have an annual meeting conducted in accordance with the company's Restated Certificate and bylaws.[19]

### B. *The Expansion Directors Are Also Up For Election*

■ In Anchor's reply brief, it asserts that the Expansion Directors are not up for election at this year's annual meeting for a distinct reason. Section 223(b) of the DGCL states that

[i]n the case of a corporation the directors of which are divided into classes, any directors chosen under subsection (a) of this section shall hold office until the next election of the class for which such directors shall have been chosen, and until their successors shall have been chosen. . . .

According to Anchor, that statutory' provision trumps the express provisions of the Anchor bylaws, which plainly state:

Section 3.4 Vacancies. Subject to the rights, if any, of the holders of any series of Preferred Stock to elect additional directors under circumstances specified in a Preferred Stock Designation, and except as set forth in the Certificate of Incorporation, a vacancy on the Board of Directors, however occurring, *whether by increase in the number*

*of directors*, death, resignation, retirement, disqualification, removal from office or otherwise, *may be filled, until the next election of directors by the stockholders by the affirmative vote of a majority of the total number of directors then remaining in office*, though they may constitute less than a quorum of the Board of Directors, or by a sole remaining director. (Emphasis added).

By the normal operation of legal hierarchy under the DGCL, Anchor argues, the company's bylaws must give way if they are inconsistent with a statutory or certificate provision. Such an inconsistency exists here, says Anchor, because the Restated Certificate's mandate that a classified board system be implemented created a situation where § 3.4 of the Anchor bylaws could only be given effect by ignoring the supposedly clear mandate of § 223(b).

Although Anchor's argument is not without a surface logic, it is unconvincing at a deeper level. Pursuant to § 223(a), the bylaws of a corporation may, absent a contrary certificate provision, eliminate the ability of a board of directors to fill newly created directorships entirely, leaving that power exclusively to the stockholders. Given the express statutory authorization of this broader power to constrict the authority of directors, it is difficult to discern

---

Id. at 1006. Here, similar considerations counsel in favor of permitting the plaintiffs to press their claim, irrespective of whether certain plaintiffs are affiliated with directors who supported the Resolution. The right of the stockholders of Anchor generally to elect their board should not be denied by the actions of particular directors.

This case is distinguishable for at least two reasons from the case of *Stengel v. Rotman*, Del. Ch., C.A. No. 18109, mem. op., Strine, V.C., 2001 WL 221512 (Feb. 26, 2001), upon which Anchor relies. In *Stengel*, the plaintiff who was held to be estopped was the only stockholder challenging the actions at issue, and therefore the only question was whether

his own actions could bind himself. That the estopped plaintiff was alone in challenging the actions is not surprising because he sought to invalidate a stockholder election on the basis of technical, not substantive, concerns that he failed to raise before or at the special meeting. The plaintiff's acquiescence could not be viewed as mistaken because he was represented by counsel at all relevant times and had consented to a stay of pending litigation in this court precisely because the election might moot certain claims.

**19.** Id. at 1006.

the logic of reading § 223(b) as precluding the lesser restriction reflected in $3.4 of the Anchor bylaws. The lesser restriction permits the corporate enterprise to function with a full complement of directors between annual meetings, avoiding the need for special interim elections, but also ensuring that all new directors will face the electorate within thirteen months or so of their initial appointment. This seems like a perfectly rational approach.

The rationality and statutory validity of this approach was implicitly recognized in a prior opinion of this court. In *DiEleuterio v. Cavaliers of Delaware, Inc.*[20], a corporation with a classified board had a bylaw provision that permitted vacancies to be filled by the sitting directors only until the next meeting of stockholders at which directors would be elected. Although the case did not turn on the validity of that provision, Chancellor Allen's thoughtful opinion in that case obviously assumed that the provision was valid and expressly acknowledged that the provision served important stockholder interests.[21] Chancellor Allen's opinion also traced the statutory history of § 223's evolution and the case law pertinent to that development. His recitation is devoid of any support for the proposition that § 223 should be read as permitting a bylaw to eliminate the ability of sitting directors to fill newly created directorships on a classified board altogether, but also be understood as prohibiting a bylaw from permitting sitting directors to fill newly created directorships on a classified board only until the next meeting at which stockholders will elect directors. In its briefs, Anchor has failed to identify any public policy logic behind its position.

In view of the general Delaware public policy favoring enfranchisement of the stockholders and the illogic of Anchor's position, § 223(b) is best read in concert with § 223(a). To the extent that a bylaw provision such as § 3.4 of the Anchor bylaws, empowers directors to fill newly created directorships only for a limited period, that provision should be read as a choice by the corporation to deviate from the default power set forth in § 223(a). This deviation takes the appointment power of the board over newly created directorships out of the purview of § 223(b), because that power is not exercised under § 223(a), but under the company's bylaw.

In this case, that reading of the statute consists with the most reasonable reading of § 7.2(b) of the Restated Certificate. By its express terms, § 7.2(b) only gave the Holdover Board the power to determine the number of the First Classified Board and to divide that number into three parts as nearly equal as possible. Section 7.2(b) then contemplates that the First Classified Board would be "elected." As discussed previously, this language supports the idea that the persons to hold all the positions on the First Classified Board would be elected by the stockholders. It is much more difficult to square with the proposition that a decision by the Holdover Directors to set the size of the First Classified Board at a larger number than existed at the end of the Initial Period resulted in the creation of new directorships that the Holdover Board could "fill" free from the temporal restrictions plainly set forth in § 3.4 of the Anchor bylaws.

Noticeably absent from § 7.2(b) is any language giving the Holdover Board the authority "to fill" seats created by any decision to make the First Classified Board larger than the Holdover Board. Yet, § 223 explicitly uses forms of the verb "fill" rather than "elect" when referring to

**20.** Del. Ch., Allen, C., 1987 WL 6338 (Feb. 9, 1987).

**21.** 1987 WL 6338 at *8.

a board's power to install a person in a newly created directorship. By contrast, § 223 consistently refers to the term "election" only in connection with situations when stockholders choose directors. "Election" is the same word used by § 7.2(b) of the Restated Certificate to refer to the process by which the First Classified Board was to be chosen.[22]

Therefore, there is no basis to infer that § 7.2(b) of the Restated Certificate was intended as an implicit repeal of § 3.4 of the Anchor bylaws. Section 7.2(b) contains no language authorizing the Holdover Board to "elect" any directors, much less any language embodying a purpose to broaden the power of the Anchor board to fill newly created directorships beyond that set forth in § 3.4 of the bylaws.[23]

For all these reasons, I conclude that all fifteen classified seats are up for election at this year's annual meeting.

### V. *Conclusion*

The plaintiffs' motion for summary judgment is granted. Anchor's motion for summary judgment is denied. The parties shall confer and present a conforming order within seven days.

22. Anchor's governing instruments deal with the concept of electing directors as an attribute of stockholder power exclusively. The board's power of election is referred to only in connection with officers and agents. Its vacancy filling authority is described without the use of the terms elect or election.

While Anchor points out that I and other members of this court have occasionally lapsed into using the word "elect" to describe a board's decision to fill a vacancy, those lapses do not suffice to diminish the conclusion that § 7.2(b)'s use of the term "election" is more naturally read as referring, per the DGCL, to a power of the Anchor stockholders.

23. In this regard, I note that the March 8 Resolution expressly referenced § 3.4 of the bylaws in the appointment of the Expansion Directors. While I do not give this determinative weight, it does explain why Anchor's arguments regarding the Expansion Directors were so muted. To the extent that certain board members believed that the board had the authority to elect the First Classified Board, their thought process did not involve arguments specific to the Expansion Director positions. Rather, their thinking centered on all fifteen positions which were to comprise the First Classified Board.