**HARRAH'S ENTERTAINMENT, INC., a Delaware corporation and Harrah's Operating Company, Inc., a Delaware corporation, Plaintiffs,**

v.

**JCC HOLDING COMPANY, a Delaware corporation, Defendant.**

Civ.A. No. 19479.

Court of Chancery of Delaware, New Castle County.

Submitted May 29, 2002.
Decided May 31, 2002.

*um Corp.,* 61 A.D.2d 910, 402 N.Y.S.2d 822 (N.Y.App.Div.1978).

Kevin G. Abrams, Thomas A. Beck, Daniel A. Dreisbach, Lisa R. Stark, Kelly A. Green, and John D. Hendershot, of Richards, Layton & Finger, Wilmington, Delaware; Charles W. Cox, II, of Latham & Watkins, Los Angeles, California; Mark A. Finkelstein, of Latham & Watkins, Costa Mesa, California, of counsel for Plaintiffs.

Robert K. Payson, Peter J. Walsh, Jr., Stephen C. Norman, Michael A. Pittenger, Janine M. Salamone, Brian C. Ralson, and John M. Seaman, of Potter Anderson & Corroon, Wilmington, Delaware, for Defendant.

## OPINION

STRINE, Vice Chancellor.

This is a dispute over whether plaintiff Harrah's Entertainment, Inc. ("Harrah's" or "HET") can nominate more than one director for election at the annual meeting of defendant JCC Holding Company, Inc., now scheduled for June 4, 2002. Harrah's nominated two candidates to compete for the two board seats up for election at that annual meeting.

JCC rejected Harrah's second nominee, contending that language in the JCC charter limited Harrah's to nominating one director at this meeting – the first to occur after JCC's most recent bankruptcy reorganization (the "First Anniversary Meeting"). In the recent reorganization, JCC's charter and bylaws were rewritten, and a classified board structure was put in place for three years. For the first year following the reorganization, Harrah's – which obtained 49% of the common stock in the reorganization – was allotted three of the seven board seats. JCC's "Noteholders" were given the right to name the other four board members. The Noteholder-nominee directors on the JCC board (the "Noteholder Directors") were also given exclusive control over transactions between JCC and Harrah's during the three-year classified board period.

One of the seats now up for election is held by a director originally nominated by Harrah's; the other is held by a director nominated by the Noteholders. By nominating two candidates of its own choosing, Harrah's hopes to elect a board that will tilt 4–3 its way. By rejecting the second Harrah's nomination, the current Noteholder Director majority hopes to perpetuate its majority control during the three-year classified board period.

The JCC board has based its rejection of the Harrah's nominee on language in the company's charter (the "Specific Nomination Provision"), which states that Harrah's and the Noteholder Directors each have the "right" to nominate one director at the First Anniversary Meeting. Similar language governs their right to nominate one director at the second meeting after the reorganization (the "Second Anniversary Meeting"). JCC contends that this

"right" limits Harrah's ability to nominate additional directors under the general section of JCC's bylaws governing nominations by stockholders (the "General Nomination Provision"). By contrast, Harrah's argues that its special "right" to nominate one director without complying with the General Nomination Provision's advance nomination deadline does not preclude its right to nominate additional directors, so long as it complies with that deadline.

In this post-trial opinion, I conclude that Harrah's nomination of a second director was improperly rejected by JCC. On their face, the JCC charter and bylaws are most reasonably read as not restricting Harrah's ability to nominate more than one director, so long as its additional nominations are made in compliance with the General Nomination Provision. The JCC charter and bylaws are not susceptible to only one reasonable reading, however. Therefore, I have examined the extrinsic evidence in reaching my decision. But I have done so in a manner that is mindful that JCC is attempting to restrict Harrah's from exercising core electoral rights, and that the rule of contract construction in favor of the free exercise of franchise rights is implicated. For that reason, in the absence of clear and convincing evidence in favor of JCC's restrictive interpretation, I have resolved the residual doubts I harbor about the instruments' meaning in favor of Harrah's, and against a reading that would limit its fundamental electoral rights.

## I.

### A.

JCC owns Harrah's New Orleans Casino. The Casino has had a troubled history, and in 1995, the entity that previously owned it filed for bankruptcy. In 1998, a subsidiary of JCC acquired the exclusive right to own and operate the Casino for 25 years. In the ensuing reorganization, two classes of JCC stock were issued, which voted separately on the election of directors to a six-person staggered board. The Class A stock was owned by former noteholders of the bankrupt entity; the Class B stock was owned entirely by a Harrah's subsidiary. Each class was entitled to elect three directors. A Class A and Class B director served in each of the three classes of the staggered board.

The Casino, which had previously operated out of temporary quarters, shut its doors in 1995. By October 1999, it had reopened at permanent quarters. But the Casino failed to generate sufficient revenues to enable JCC to cover its operating expenses and pay the $100 million and $21 million in annual tax payments guaranteed to Louisiana and the City of New Orleans, respectively. Facing events of default in March 2001, JCC had to consider another bankruptcy filing.

### B.

To that end, in January 2001, the JCC board voted to file a bankruptcy petition. That reorganization ultimately occurred in late March of 2001, resulting in the cancellation of all of JCC's Class A and Class B stock. In turn, JCC issued over 12 million shares of new common stock. Harrah's received 49% of the new common stock, the Noteholders received 37%, and JCC's primary lender, Bankers Trust, received 14%. The provisions of JCC's new charter and bylaws – particularly those governing board composition – are central to the present dispute. I now describe the undisputed aspects of these key provisions.

First, it is undisputed that the JCC charter provides for a seven-member classified board, divided into three "Groups." Group I, comprised of two directors, serves an initial one-year term. One of

the initial Group I directors was nominated by Harrah's; the other was nominated by the Creditor's Committee (*i.e.,* the Noteholders and Banker's Trust acting together). Group II, comprised of two directors, serves an initial two-year term. One of the initial Group II directors was nominated by Harrah's, and the other by the Creditor's Committee. Group III, comprised of three directors, serves an initial three-year term. One of the initial Group III directors was nominated by Harrah's; the other two were nominated by the Creditor's Committee.

In sum, the initial post-reorganization board was comprised of three members nominated by Harrah's (the "Harrah's Directors") and four members nominated by the Noteholders and Banker's Trust (the "Noteholder Directors"). Because several of the contemplated directors needed to be approved by the Louisiana Gaming Control Board, the charter phased in the seven-member board, ensuring that there would be an equal balance between the Harrah's and the Noteholders' nominees until all the approvals were received.

The classified board structure set up by the charter is to expire on the third anniversary of the reorganization plan (the "Third Anniversary Meeting"), at which time control of the JCC board is indisputably up for grabs. Until that time, that structure can only be repealed by a charter amendment supported by at least 90% of the outstanding shares, the same level of support needed for a short-form merger under 8 *Del. C.* § 253.[1]

It is also undisputed that the JCC directors who were nominated by the Noteholders have exclusive authority over a defined set of transactions for a period of not less than three years. Section 3.2(c) of ·the charter – the "Affiliated Transaction Provision" – embodies this concept. In essence, the Affiliated Transaction Provision gives the Noteholder Directors complete authority over any transactions between Harrah's and JCC not already agreed upon in the reorganization. In particular, the Noteholder Directors have full authority over JCC's decision-making under the Casino's management agreement. The Affiliated Transaction Provision can only be repealed by a charter amendment garnering a 90% vote.

The charter also contains limitations on the ability of the board to fill vacancies during the three-year period when the classified board structure is to be in place. In that time frame, if a vacancy arises in a board position filled by a nominee of the Noteholders, only the Noteholder Directors can fill that vacancy. Likewise, if a vacancy arises in a board position filled by a nominee of Harrah's, only the Harrah's Directors can name the successor. Similarly, a Noteholder Director can only be removed by the other Noteholder Directors, and a Harrah's Director can only be unseated by the other Harrah's Directors.[2] Like the classified board structure, these provisions of the charter may only be repealed by a 90% vote during the three years after the reorganization. At the end of that period, these provisions expire along with the classified board structure.

---

1. Of course, any stockholder's ability to vote on any charter amendment is subject to its prior ability to get a majority of the JCC board to vote for the amendment. *See* 8 *Del. C.* § 242 (amendment of certificate of incorporation after receipt of payment for stock and non-stock corporations).

2. The framers of the charter appear to have assumed that a sitting director could be removed by her peers, with or without cause, from a classified board. Whether this is so I need not decide.

The charter provision at the heart of this dispute is Section 3.2(b)(iv), or the "Specific Nomination Provision." That section reads as follows, and this controversy centers on the meaning of the highlighted phrases dealing with nominations:

The Nominated Directors in Group I, listed in subsection (b)(i) of this Section 3.2, shall serve for a term expiring on the date of the annual meeting of stockholders as established in the Corporation's bylaws, but not occurring earlier than the first anniversary of the Effective Date of the Plan of Reorganization (the "First Anniversary Meeting"). *At the First Anniversary Meeting, HET and the majority of the Non–HET Nominated Directors will each have the right to nominate one director to serve two-year terms.* The Nominated Directors in Group II shall serve for a term expiring on the date of the annual meeting of stockholders occurring not earlier than the second anniversary of the Effective Date of the Plan of Reorganization (the "Second Anniversary Meeting"). *At the Second Anniversary Meeting, HET and the majority of the Non–HET Nominated Directors will each have the right to nominate one director to serve one-year terms.* The Nominated Directors in Group III shall serve for a term expiring on the date of the annual meeting of stockholders occurring not earlier than the third anniversary of the Effective Date of the Plan of Reorganization.

Article III, § 1(a) of the JCC bylaws contains language to the same effect as the Specific Nomination Provision, and they will be defined singularly. This dispute about nominations turns importantly on the interaction between the Specific Nomination Provision in the charter and Article III, § 1(b) of the JCC bylaws (the "General Nomination Provision"), which reads as follows:

*Subject to the nomination provisions of Section 1(a) of this Article III [i.e., the Specific Nomination Provision], nominations of persons for election to the Board of Directors of the Corporation at the annual meeting may be made in the notice for such meeting by the Board of Directors or at such meeting by or at the direction of the Board of Directors, by any committee or persons appointed by the Board of Directors, or by any stockholder of the Corporation entitled to vote for the election of Directors at the meeting who complies with the notice procedures set forth in this Section 1 of Article III. Such nominations by any stockholder shall be made pursuant to timely notice in writing to the Secretary of the Corporation. To be timely, a stockholder's notice shall be delivered ... not less than sixty days nor more than ninety days prior to the first anniversary of the preceding year's annual meeting.... No person shall be eligible for election as a Director of the Corporation unless nominated in accordance with the procedures set forth herein. The Officer of the Corporation presiding at an annual meeting shall, if the facts warrant, determine and declare to the meeting that a nomination was not made in accordance with the foregoing procedure ... and if he should so determine, he shall so declare to the meeting and the defective nomination shall be disregarded.*

### C.

Discord returned to JCC in the year following the reorganization.[3] On Febru-

---

**3.** Via vague deposition testimony, each party has attempted to persuade me that the feud between them is the fault of the other. The reasons for the fight are largely irrelevant,

ary 25, 2002, Harrah's nominated two directors for election at the First Anniversary Meeting, then scheduled for April 25, 2002. Harrah's nominated Philip Satre, a Harrah's Director, for re-election under the Specific Nomination Provision. It then nominated Charles Teamer for election to the seat currently held by Noteholder Director Rudy Cerone. Teamer was nominated under the General Nomination Provision. JCC's board rejected the Teamer nomination, by a 4–3 vote, with the Noteholder Directors voting as a block. The board majority took the position that Harrah's could only nominate one director at the First Anniversary Meeting.

JCC's position is that the language of the Specific Nomination Provision giving Harrah's the "right to nominate one director" at the "First Anniversary Meeting" is a limitation on Harrah's ability to nominate more than one director at that meeting. It says that the Noteholders negotiated for this provision explicitly so as to limit Harrah's ability to obtain a majority of the JCC board during the three years following the reorganization. Because Harrah's gained 49% of the common stock in the reorganization, the Noteholders feared that it could obtain a board majority at the First Anniversary Meeting if there were no restrictions on its ability to nominate and elect directors.

The Specific Negotiation Provision's effect as a limitation on Harrah's nomination rights is reinforced, JCC says, by the first sentence of the General Nomination Provision. By making the General Nomination Provision rights of stockholders "subject to" the language in the bylaws specifically addressing Harrah's right to nominate one director at the First Anniversary Meeting, the argument goes, the drafters of the bylaws were vitiating any rights Harrah's would otherwise have to nominate more

than one director at the First Anniversary meeting under the General Nomination Provision. Put differently, JCC contends that "one means one," and that the use of the limiting words "subject to" in the General Nomination Provision were intended to limit Harrah's to the number set forth in the Specific Nomination Provision.

In contrast, Harrah's contends that the right it had to nominate one director at the First Anniversary Meeting under the Specific Nomination Provision does not limit its ability to nominate additional candidates under the General Nomination Provision. Rather, it contends that the Specific Nomination Provision gives both Harrah's and the Noteholder Directors a special "right" to nominate one candidate without following the advance nomination requirements set forth in the General Nomination Provision. This ensured that Harrah's would have been able to nominate at least one director at the First Anniversary Meeting, if the Noteholder Director majority then on the board decided not to nominate the incumbent Harrah's Director. Likewise, it protected the Noteholders at the Second Anniversary Meeting by permitting the Noteholder Directors to nominate at least one director if the new board majority did not decide to re-nominate the incumbent Noteholder Director. As the General Nomination Provision clearly states, the only candidates who could be nominated after the advance nomination deadline were those nominated: (a) by the board of directors, or (b) in accordance with the Specific Nomination Provision. Stated summarily, Harrah's argues that the "subject to" language in the General Nomination Provision makes clear that the advance nomination deadline does not act as a limitation on the rights granted to Harrah's and the Noteholder Di-

and, in any event, no reliable inferences about those reasons can be drawn from this record.

rectors in the Specific Nomination Provision.

Harrah's further argues that under well-settled rules of construction, a restriction of the type advocated by JCC should be enforced only if clear evidence supports JCC's interpretation. Harrah's says that the extrinsic evidence shows the Noteholders gave up their demand for majority control of the JCC board for the three years after the reorganization, in exchange for the Affiliated Transaction Provision.

## D.

The negotiations over the balance of power in the post-reorganization company were protracted and marked by the presence of highly paid advisors.[4] Because the reorganization plan contemplated further investments by Harrah's, that entity sought to maximize its managerial control. The Noteholders wanted the same, but for different reasons. JCC's advisors had projected that it would take three years for the company to turn itself around, and the Noteholders – who had already suffered two bankruptcies under the Harrah's managed-Casino – did not trust Harrah's to execute the reorganization's business plan. The Noteholders also sought to protect themselves from potential self-dealing by Harrah's stemming from related party contracts between JCC and the Harrah's affiliates which managed the Casino. Banker's Trust, which represented a syndicate of lenders, was largely aligned with the Noteholders on these subjects.[5]

The need to deal with the State and City on tax issues played into the time frame in which Harrah's and the Noteholders had to hammer out their differences. The Governor of Louisiana was unwilling to present the Legislature with a bill altering the existing tax payments from the Casino before he was sure that Harrah's and the Noteholders would not later blow up the deal.

## E.

For that reason, Harrah's and the Noteholders worked urgently in December 2000 and early January 2001 to hash out a memorandum of understanding ("MOU") dealing with the key points of a reorganization plan. This MOU would provide JCC with a basis to file a pre-packaged reorganization plan in Bankruptcy Court, and give the Governor the assurance he needed to undertake a legislative initiative to reduce the tax burden on the Casino.

An early divergence in negotiation objectives soon gave way to some tentative compromises on both sides. At the outset, the Noteholders sought 51% of the equity, with Harrah's and Banker's Trust splitting the remaining 49%. They also sought to install four Noteholder members on a seven-member JCC board, with all of those directors being placed in the "rear class" of the classified board – thus ensuring that

---

4. Harrah's employed Latham & Watkins as its outside counsel, and Bear Stearns & Co. as its financial advisors. The Noteholders (who were eventually formally constituted as a Noteholders Committee by the Bankruptcy Court) retained Skadden, Arps, Slate, Meagher & Flom as its legal counsel, and Houlihan Lokey Howard & Zukin Capital as its financial advisor.

5. JCC itself had an awkward position in the negotiations. Because the two primary factions that controlled its board were in contentious discussions, the company's own managers and advisors were present at, but not active in, the haggling over control of the post-reorganization entity. However, JCC's outside counsel, Adams and Reese, did help draft many of the important post-reorganization corporate instruments, including JCC's revised charter and bylaws.

they would not face electoral risk for three years.

Harrah's pushed back. It demanded 49% of the common stock, with the remaining 51% to be split between the Noteholders and Banker's Trust (with the Noteholders receiving 37% and Banker's Trust 14%, respectively). While unwilling to cede control of the board to the Noteholders for three years, Harrah's was not averse to giving them control for one year, because of the initial equity split. Harrah's was also receptive to the idea of vesting exclusive control over certain transactions between JCC and Harrah's affiliates in the JCC directors who were not nominated by Harrah's – provided that such a provision could be repealed upon a supermajority vote in favor of a charter amendment.

A compromise along these lines seemed to be in the works. On January 9, 2001, Harrah's financial advisor sent William "Tuck" Hardie, the Noteholders' financial advisor from Houlihan Lokey, a proposal reflecting this basic trade-off. Hardie's e-mail response to Harrah's and his clients, which also included a revised draft MOU, stated

> [i]f HET wants to spread the directors throughout the board classes then we will require that the non-HET directors have the ability to control transfers to, modifications of agreements with and other dealings with HET in order to ensure that subsequent changes in stock ownership (and thus board membership following an annual meeting) do not deny the Noteholders the meaningful ability to exercise the rights granted to them until the three year class of directors is up for re-election.[6]

The most reasonable reading of this paragraph is that Hardie recognized that there was a direct relationship between the issue of numerical control of the board and control over specific affiliated transactions. That is, Hardie recognized that Harrah's could obtain a board majority if the Noteholder Directors were not all placed in the rear class. The Affiliated Transaction Provision eventually came about in direct response to this reality.

The compromise corporate governance provisions memorialized in the MOU reads as follows:

> ● 7 member staggered board with 3 classes of directors (with initial terms of one, two and three years) to be fixed by the Articles of Incorporation of JCC Holding. HET's three Directors initially to have one, two and three year terms, and the Bank/Bondholders' four directors shall be satisfactory to each of BTCo. and the Bondholders' Committee. The first election of directors by JCC Holdings following the Restructuring shall be made at a stockholder meeting on a date established by the Bylaws of JCC Holding under the Plan of Reorganization to be held not earlier than the first anniversary of the Effective Date of the Plan.

> ● So long as the Board includes any director not nominated by HET or unaffiliated with HET, Articles of Incorporation of JCC Holding to provide that HET nominated/affiliated directors shall not be entitled to vote with respect to [certain Defined Affiliated Transactions]. . . .

> ***

> ● The Certificate of Incorporation and Bylaws of JCC Holding shall contain supermajority voting requirement provisions requiring the affirmative vote of the holders of not less than 90% of the outstanding common stock with re-

---

**6.** JE 33.

spect to the amendment of provisions relating to the number or election of directors or the approval of Affiliated Party Transactions.... [7]

Significantly, the MOU contains no provision that purports to limit the ability of Harrah's (or any other party) to nominate or elect directors at the First Anniversary Meeting. Indeed, Tuck Hardie had noted to the Noteholders' Committee in a memorandum the prior day that "we and the banks are to select four mutually acceptable Directors for the staggered board and those Directors (*regardless of their number*) will control economic activities between JCC and HET." [8]

On January 12, 2001, JCC filed its Bankruptcy Court reorganization petition. The petition was accompanied by a disclosure statement to be sent to constituencies affected by the filing. Both the petition and the disclosure statement describe the post-reorganization composition of the JCC board. Neither document indicates an intention to guarantee the Noteholders' majority control of the JCC board for three years. A reasonable reader of those documents would assume that under the operation of Delaware corporate law, the original split in favor of the Noteholders could be changed at the First Anniversary Meeting.

In fact, Harrah's says that the issue of board control was largely a settled one by this time. Although the parties hashed out details of language later, the basic trade-off embodied in the MOU was accepted by all as settled. That is, it was understood that Harrah's could potentially obtain a board majority at the First Anniversary Meeting.

JCC contends otherwise. It says that the MOU was just a starting point, which was necessary only to get the political authorities in Louisiana moving towards a legislative change in JCC's tax obligations. According to JCC, throughout February and March, the Noteholders continued to demand majority control of the JCC board for three years.

Neither party's explanation of the significance of the MOU is fully convincing. For example, on January 12, 2001, Harrah's general counsel, Steve Brammell, presented a memorandum to his board of directors describing the basic terms of the MOU. In that document, Brammell indicated that important corporate governance issues remained open, and did not articulate the basic compromise that appears to be reflected in the final MOU and the earlier Hardie e-mail. At trial, Brammell explained that he had actually written the document several days before January 12, but admitted that he had revised it at late as January 11. Furthermore, Harrah's then-CFO, Colin Reed, testified in his deposition that the final agreement regarding the composition of the board was not reached until near the end of all the negotiations between Harrah's and the Noteholders. He also did not view that MOU as deciding the board control issue:

> I mean basically what this [MOU] talks about is it's not particularly clear. What this talks about is three classes of directors—one-year, two-year, three-year terms. The question is, What happens at the end of the first year? Who has the right to nominate? Who has the right to, you know, put up the new nominee? And that wasn't covered here. [9]

This recollection, however, is at odds with that of the Harrah's negotiators who were

7. JE 42.

8. JE 40 at 2 (emphasis added).

9. Reed Dep. at 77.

directly present at the negotiations, and seems to reflect a temporal misunderstanding. Nonetheless, it casts doubt on the idea that the MOU embodied a definitive compromise on board control – doubt that is reinforced by the later stages of the negotiations.

Adding to the muddle, however, is the fact that some of the Noteholders' key drafters assumed (rather strangely) that the Noteholders had somehow obtained control of the board for at least three years at the MOU stage of the negotiations. For example, Lynn Hiestand, a Skadden, Arps attorney who played a major role in the later drafting process (but not at the MOU stage for the Noteholders), viewed the board control issue as a settled one, which the drafters simply had the job of implementing. Her testimony is best read as indicating that the basic business deal on this point was done by the time she got heavily involved in February.[10] Her only uncertainty was whether the board split was supposed to last for three years, or to persist perpetually. Meanwhile, Tuck Hardie's trial testimony regarding the MOU was frustratingly vague. His refusal to acknowledge the relationship his January 9 e-mail drew between an Affiliated Transaction Provision and board control was difficult to accept.

On balance, however, I conclude that the MOU stage of the negotiations had not definitively settled the issue of board control; rather, it had merely closed the gap between the parties sufficiently to permit the process to forge ahead, and provided the Governor with the impetus he needed to commence a legislative initiative. Har-rah's did, however, come out of the MOU process with a reasonable expectation that it could obtain board control after one year, but it knew that many details and trade-offs remained to be made. As shall be seen, some of these touched directly on issues of corporate control.

## F.

The end of the MOU process brought an important change in the negotiating dynamics. From February onward, much of the process of haggling over corporate control issues was delegated to the lawyers, many of whom had not been major participants in (or even present at) earlier discussions. These lawyers attempted to act on what they understood to be the purpose of the MOU. From Harrah's perspective, that meant securing the ability of Harrah's to obtain a board majority at the First Anniversary Meeting. From the Noteholders' perspective, that meant locking in the initial board split for as long as possible.

It was only during this phase of negotiations that a draft charter was first created. That first draft, submitted by JCC's counsel Adams & Reese on February 2, 2001, is unclear on the issue of board control. The draft set forth the initial split in favor of the Noteholders, and included a prohibition on changing the size of the board or altering the split, except by a 90% charter vote.[11] At the same time, the charter contained no explicit limitation on who could nominate successors for the initial directors as their terms expire, and thus

10. In her deposition, Hiestand admitted that she was told by her colleagues at Skadden, Arps that her clients had obtained control of the board for at least three years, that she acted on that assumption in negotiating drafts, that neither her clients nor Harrah's ever explicitly indicated that that was their agreement in her presence, and that the basic understanding on this point had been reached at the MOU stage. *See, e.g.,* Hiestand Dep. at 113–115, 137–140.

11. JE 52, § 3.2(a).

implied that the typical procedures governing corporate elections would apply.

George Rice, Harrah's lead counsel from Latham & Watkins, commented on the draft, seeking the insertion of language that would have made the provisions dealing with the board split expire as to each of the three classes on the board when their initial terms expired.[12] The defendants contend, with some logic, that Rice's comments reflect a concern that the initial charter draft would have locked in the split in future elections, by defining each class of directors as consisting of two subclasses, divided between seats for which candidates could only be elected by the Noteholders and seats for which candidates could only be elected by those elected by Harrah's. Rice's comments could also, however, be read as reflecting Harrah's view that it wanted as simple a charter as possible and wished to phase out any transitional provisions (such as specific classes of directors) as soon as possible.[13]

This latter interpretation becomes somewhat less tenable when the remainder of the iterative process of drafting the charter is considered. This later process is marked by a rejection of Rice's initial approach to the sunset issue, and by the addition of other provisions which can be read as having the intended effect of cementing Noteholder control during the first three years.

For example, the seven-member board was phased in so that an even balance between Harrah's and the Noteholders' Directors would exist until all the initial directors had been approved by the Gaming Control Board.[14] Likewise, it was agreed that a vacancy in a director position nominated by Harrah's would be filled by Harrah's, and that a vacancy in a position nominated by the Noteholders would be filled by them.[15] It is important to note, however, that these provisions can also be read solely as protecting the Noteholders' ability to preserve their board representation – whether majority or minority – from unforeseen events or removal.

As of this stage in the negotiations, the draft charter also contemplated that the classified board structure would remain in place beyond three years. That is, regardless of who controlled the board, the draft indicated that after the initial board terms, successors would be elected to three-year terms.[16]

## G.

The final stage in the negotiations on board control began in late February. By then, an additional ingredient had been stirred into the negotiation mix. For the first time in the negotiations, Banker's Trust began actively participating through Eric Berg, of White & Case, who advocated greater control over the board for the stockholders other than Harrah's. On March 5, Berg sent comments out expressing the view that the then-current working draft of the charter provided "insufficient protection" and querying "who nominates, etc."[17] Between that time and the time an "all-hands" meeting was scheduled to occur on March 8, 2001, Adams & Reese produced another draft of the charter, which stated in pertinent part that:

**12.** JE 64.

**13.** *Cf.* Hiestand Dep. 74–75 (describing Rice's suggestion as an "inartful" way to sunset the provisions in three years).

**14.** JE 65.

**15.** *Id.*

**16.** *See, e.g.,* JE 68, § 3.2(c); JE 71, § 3.2(c).

**17.** JE 67.

The Nominated Directors in Group I, listed in subsection (b) of this Section 3.2, shall serve for a term expiring on the date of the annual meeting of stockholders as established in the Corporation's bylaws, but not occurring earlier than the first anniversary of the Effective Date of the Plan of Reorganization. The Nominated Directors in Group II shall serve for a term expiring on the date of the annual meeting of stockholders occurring not earlier than the second anniversary of the Effective Date of the Plan of Reorganization. Thereafter the provisions of subsection (b) of this Section 3.2 for Group II Nominated Directors shall expire. -The Nominated Directors in Group III shall serve for a term expiring on the date of the annual meeting of stockholders occurring not earlier than the third anniversary of the Effective Date of the Plan of Reorganization. Thereafter the provisions of subsection (b) of this Section 3.2 for Group III Nominated Directors shall expire, and this Section 3.2(b) shall be of no further force or effect. The designated number and term of the Nominated Directors may only be altered, amended, changed or repealed by an affirmative vote of not less than ninety percent (90%) of the issued and outstanding shares of the Common Stock (including HET and its affiliates).[18]

The highlighted language incorporated Rice's year-by-year sunset idea, but with a twist. The sunset Adams & Reese drafted does not trigger for the Group I directors until the Third Anniversary Meeting, but it does seem to trigger for the Group II directors after the Second Anniversary Meeting. This method of incorporating Rice's sunset idea could be seen as an attempt to protect Noteholder board con-

trol until the Second Anniversary Meeting. It does so by implying that the reason the sunset provisions were phased in was to ensure that the original board balance would persist until the Second Anniversary Meeting. Thus, the draft can be read as a rejection of Rice's negotiation position for Harrah's, but also as calling for only two years of Noteholder control.

But the draft is inconclusive on that point, because it does not expressly set forth any limitations on Harrah's – or the Noteholders' – ability to nominate and elect more than one director of their own choosing at the First and Second Anniversary Meetings. Contemporaneous with this draft, Adams and Reese circulated draft bylaws, which contained a general nomination provision, but did not speak to this question.

On March 8, the meeting participants pored over the proposed charter and bylaws, as is reflected in notes taken by Adams & Reese attorney David Johnson.[19] Based on the negotiations that day, Adams and Reese generated another draft of the charter and bylaws. The draft charter states in relevant part that:

The Nominated Directors in Group I, listed in subsection (b) of this Section 3.2, shall serve for a term expiring on the date of the annual meeting of stockholders as established in the Corporation's bylaws, but not occurring earlier than the first anniversary of the Effective Date of the Plan of Reorganization (the "First Anniversary Meeting"). At the First Anniversary Meeting, HET and the Creditors' Committee will each have the right to nominate one director to serve two-year terms. The Nominated Directors in Group II shall serve for a term expiring on the date of the annu-

18. JE 71 at 4 (underlined in original).

19. JE 76.

al meeting of stockholders occurring not earlier than the second anniversary of the Effective Date of the Plan of Reorganization (the "Second Anniversary Meeting"). At the Second Anniversary Meeting, HET and the Creditors' Committee will each have the right to nominate one director to serve one-year terms. Thereafter the provisions of subsection (b) of. this Section 3.2 for Group II Nominated Directors shall expire. The Nominated Directors in Group III shall serve for a term expiring on the date of the annual meeting of stockholders occurring not earlier than the third anniversary of the Effective Date of the Plan of Reorganization. Thereafter the provisions of subsection (b) of this Section 3.2 for Group III Nominated Directors shall expire, and this Section 3.2(b) shall be of no further force or effect.... [20]

This revision is notable not solely because it addresses the point made by Berg in his comments on behalf of Banker's Trust, and does so in a way that arguably sheds light on the phase-in of the sunset. The new nomination language is also the first manifestation of the Specific Nomination Provision. If the new "right" of Harrah's and the Noteholder Directors to nominate one director apiece at each of the initial two meetings is read as a limitation, the new draft worked hand-in-glove with the sunset provision to preserve a Noteholder board majority until the Third Anniversary Meeting. Although the use of the word "right" is affirmative, the use of the word "one" is arguably suggestive of a negotiated limitation, when considered in the context of the evolution of the draft.

Equally noteworthy are the changes Adams & Reese made to the draft bylaws that evening. In the new draft, the General Nomination Provision under the bylaws was made "Subject to the nomination provisions of Section 3.2 of the Amended and Second Restated Certificate of Incorporation...." [21]

But also consistent with Johnson's notes of the March 8 meeting,[22] the new draft also eliminated the classified board structure as of the Third Anniversary Meeting. The draft did so by inserting a new § 3.2(f) that read, "Unless otherwise set forth in this Section 3.2, each Director will be elected for a one year term." [23] The elimination of the classified board at this point gives rise to another reading of the sunset phase-in and new nomination language. Under this reading, Harrah's and the Noteholder Directors each received enhanced rights to nominate a director apiece for the two relevant classes at the First and Second Anniversary Meetings, but it was agreed that those special rights would expire once the board became declassified.

The status of the Affiliated Transaction Provision as of this time is also worthy of note. As it existed at that time, the Provision would stay in effect perpetually unless removed by a 90% charter vote. Moreover, by its own terms, the Affiliated Transaction Provision had teeth so long as there was any independent director, *i.e.*, a "Non–HET Affiliated Director" on the JCC board. That is, absent a 90% charter vote for repeal, the independent directors on the JCC board would continue to have the exclusive authority to review Affiliated Transactions, even after the classified board structure expired and even if there

---

**20.** JE 78 at 5 (underlined emphasis in original).

**21.** JE 79 at 5.

**22.** JE 76.

**23.** JE 78 at 7.

were no Noteholder Directors remaining on the board.

Although there were several later drafts generated before the finalization of the charter and bylaws, the basic approach taken to the nomination issue never changed after March 8, 2001. What did change late in the game was the provision dealing with the duration of the Affiliated Transaction Provision. As late as March 28, 2001 itself – the very day the charter was finalized – the working draft contemplated that the Affiliated Transaction Provision could only be repealed by a 90% charter vote even after the Third Anniversary Meeting.[24] The final charter, however, permitted repeal of the Affiliated Transaction Provision by a majority charter vote after that time. The record is silent on whether this last-minute change merely corrected an earlier drafting oversight or had more significance.

### H.

During the final month of negotiations, the parties appear to have conducted their back-and-forth largely through the drafting process. The record is bereft of testimony about a show-down discussion in which one side or the other blinked on the board control issue. Although the drafts can be read to support an intention on the part of the drafters to limit Harrah's nomination rights, they can also be read otherwise. None of the key lawyer-negotiators testified at trial. Nor did any witness in any testimony – be it at trial or in a deposition – recall an explicit discussion of the meaning of the Specific Nomination

Provision between Harrah's and the Noteholders' negotiators.

Hiestand, the scrivener for the Noteholders, testified in her deposition that the changes Adams & Reese made were designed to limit Harrah's ability to nominate more than one director at either the First or Second Anniversary Meeting. One of the Adams & Reese attorneys involved in making the changes indicated his belief that the new language had this purpose. But no JCC witness recalled any specific communication in which the Noteholders' negotiators made this intention plainly known to the Harrah's counterparts.

From the Harrah's side, the record is devoid of any testimony by Rice fully explaining his understanding of what the inserted language relating to nominations at the First and Second Anniversaries was intended to accomplish.[25] None of Harrah's other negotiators have explained what they thought Adams & Reese was doing when it inserted that language. Given the importance of the issue, this void is surprising.

Nevertheless, the absence of firm evidence that the Harrah's negotiators were told that the nomination language was intended to bar Harrah's from nominating more than one director at the First and Second Anniversary Meetings is equally surprising. Put bluntly, there is no reliable evidence that the Noteholders told Harrah's that the Specific Nomination Provision was intended to secure majority control by the Noteholders of the JCC board

---

24. JE 100, § 3.2(c).

25. In his deposition, Rice was not asked to give his reading of whether the Specific Nomination Provision acted as a limitation on Harrah's rights under the General Nomination Provision. Although Rice did give some testimony on the purpose of the Specific

Nomination Provision that arguably tilts in JCC's favor, see Rice Dep. 53–54, that testimony does not clearly say that Rice viewed the Provision as something other than a grant of special rights, or as a limitation on Harrah's rights under the Separate General Nomination Provision.

for three years. Indeed, the most reasonable inference from the record is that no such statement was ever forthrightly made to Harrah's. As a result, the force of any argument that Harrah's understood that the Specific Nomination Provision had the objective and effect of impeding Harrah's from obtaining board control depends largely on the clarity of the language in the ultimate charter and bylaws.

This inference is buttressed by the other contemporaneous writings of the parties created during and immediately after the end of the negotiations. None of these writings contain language stating that Harrah's had agreed to nominating restrictions so as to help ensure Noteholder board control for three years. Adams & Reese presented a written "primer" to the post-reorganization JCC board on April 25, 2001, and its description of the corporate governance provisions of the new charter does not include any indication that Harrah's was unable to nominate more than one candidate at each of the First and Second Anniversary meetings.[26] Nor did Hardie communicate this feature of the charter and bylaws in his writings to his clients,[27] despite the fact that it represented a major victory on his part. And none of the public filings made by the company at that stage describe this material issue.[28] Although the absence of such communications may just reflect a decision by Hardie not to spike the football, and by Adams and Reese to communicate only about the immediate composition of the board, it is nevertheless eyebrow-raising.

## II.

■■■ I begin my resolution of this case with a discussion of the applicable contract law principles. In general terms, corporate instruments such as charters and bylaws are interpreted in the same manner as other contracts.[29] Absent ambiguity, their meaning is determined solely by reference to their language.[30] To demonstrate ambiguity, a party must show that the instruments in question can be reasonably read to have two or more meanings.[31] And "[m]erely because the thoughts of party litigants may differ relating to the meaning of stated language does not in itself establish in a legal sense that the language is ambiguous." [32]

■■■ Ordinarily, when corporate instruments are ambiguous, the court must consider the relevant extrinsic evidence in aid of identifying which of the reasonable readings was intended by the parties.[33] There are situations, however, when this general rule is inapplicable. For example, when a court is asked to construe a limited partnership agreement drafted solely by the corporate general partner, it will resolve all ambiguities against the general partner as drafter and in favor of the

26. JE 138.

27. See, e.g., JE 104 (a short 3/30/01 memorandum simply stating that the "final terms of the transaction" were consistent with the MOU).

28. See, e.g., JE 103 at 8.

29. Hibbert v. Hollywood Park, Inc., 457 A.2d 339, 342–43 (Del.1983).

30. City Investing Co. Liquidating Trust v. Continental Cas. Co., 624 A.2d 1191, 1198 (Del.

1993); Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del.1992).

31. Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. 1992).

32. Standard Power & Light Corp. v. Inv. Assocs., Inc., 51 A.2d 572, 576 (Del.1947).

33. See, e.g., Eagle Indus. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del.1997) (general contract principle).

reasonable expectations of the public investors.[34]

■■ An arguably similar rule of construction is relevant here. When a corporate charter is alleged to contain a restriction on the fundamental electoral rights of stockholders under default provisions of law – such as the right of a majority of the shares to elect new directors or enact a charter amendment – it has been said that the restriction must be "clear and unambiguous" to be enforceable.[35] The policy basis for this rule of construction rests in the "belief that '[t]he shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests.'"[36]

There are two distinct questions that arise regarding the application of this rule of construction to this case. First, does the rule apply to a limitation on the ability of a stockholder to nominate candidates for election to the board? If the answer is yes, the second question is this: How powerful is this rule of construction when the corporate instruments that must be construed resulted from negotiations involving the party whose electoral rights those instruments arguably circumscribe?

■ With respect to the first question, I have little difficulty concluding that the rule of construction in favor of franchise rights is implicated by a purported limitation on the ability of a stockholder – particularly one owning 49% of the common stock – to nominate sufficient candidates to elect a new board majority tilting its way. Here, JCC's board has deprived Harrah's of the opportunity to nominate more than one director for election at the First Anniversary Meeting. Although this leaves Harrah's free to vote its shares as it wishes, this residual freedom loses much of its utility in the absence of a choice of candidates. By its own arguments, JCC has admitted that it views a restriction on Harrah's nomination rights as disabling Harrah's from obtaining control over the JCC board during the next three years, and for good reason.

■ Because of the obvious importance of the nomination right in our system of corporate governance, Delaware courts have been reluctant to approve measures that impede the ability of stockholders to nominate candidates.[37] Put simply, Delaware law recognizes that the "right of shareholders to participate in the voting process includes the right to nominate an opposing slate."[38] And,

34. *S.I. Management, L.P. v. Wininger*, 707 A.2d 37, 42–43 (Del.1998) (where general partner signed on investors to an agreement in which investors had no hand in drafting, *contra proferentem* applies, and ambiguous terms are construed against general partner).

35. *Centaur Partners., IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 927 (Del.1990).

36. *Id.* (quoting *Blasius Indus. v. Atlas Corp.*, 564 A.2d 651, 669 (Del.Ch.1988)); *see also McIlquham v. Feste*, 2002 WL 244859, at *6, 2002 Del. Ch. Lexis 8, at *18(Del.Ch.); *Stengel v. Rotman*, 2001 WL 221512, at *6, 2001 Del. Ch. Lexis 22, at *17 (Del.Ch.); *Comac Partners, L.P. v. Ghaznavi*, 793 A.2d 372, 383 (Del.Ch.2001); *Rohe v. Reliance Training Network, Inc.*, 2000 WL 1038190, at *11, 2002

Del. Ch. Lexis 108, at *37 (Del.Ch.); *Rainbow Navigation, Inc. v. Yonge*, 1989 WL 40805, at *4, 1989 Del. Ch. Lexis 41, at *12 (Del.Ch.); *Inv. Assocs. v. Standard Power & Light Corp.*, 48 A.2d 501, 506 (Del.Ch.1946); *aff'd*, 51 A.2d 572 (Del.1947).

37. *See, e.g., Lerman v. Diagnostic Data, Inc.*, 421 A.2d 906 (Del.Ch.1980) (invalidating as inequitable an advance nomination bylaw intended to preclude a dissident shareholder from carrying out his announced plan to conduct a proxy contest at the annual meeting).

38. *Linton v. Everett*, 1997 WL 441189, at *9, 1997 Del. Ch. Lexis 117, at *29 (Del.Ch.); *see also Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *5, 1991 Del. Ch. Lexis 9, at *17 (Del.Ch.) (same principle).

the unadorned right to cast a ballot in a contest for [corporate] office ... is meaningless without the right to participate in selecting the contestants. As the nominating process circumscribes the range of choice to be made, it is a fundamental and outcome-determinative step in the election of officeholders. To allow for voting while maintaining a closed selection process thus renders the former an empty exercise.[39]

Having answered the first question affirmatively, I now answer the more difficult question: how to apply the rule of construction favoring the free exercise of franchise rights when the party whose electoral rights are arguably limited participated directly in negotiating the disputed contractual language. There are two possible approaches.

One is to apply the rule of construction as it operates in a situation in which a dispute involves corporate insiders, on the one hand, and stockholders who had not been involved in crafting the charter, on the other. In these circumstances, the rule logically applies before the consideration of parol evidence because it is inequitable to burden the rights of public stockholders based on an obscure drafting history to which they were not a party. It is better policy to read the charter in the manner most favorable to the free exercise of traditional electoral rights, in a situation in which the charter is susceptible to more than one reasonable interpretation.

In the interests of overall economic efficiency, it can be argued that this same approach ought to apply even when the party whose electoral rights are in question participated in negotiating the instrument. By such a rule, the courts would force drafters in all situations to write with clarity if they wished to change the usual manner in which corporate elections take place. This policy choice will also limit the scope of judicial review, by cutting off expensive and time-consuming inquiries into drafting history.

The alternative approach would recognize that what makes sense in the context of disputes involving the rights of stockholders who were not involved in the drafting process does not operate fairly in a case like this one. When a sophisticated party like Harrah's has negotiated the provisions of corporate instruments for several months, it should fairly expect to have those provisions interpreted in the traditional manner, which permits recourse to extrinsic evidence in the event of ambiguity. It would provide a windfall for a party like Harrah's, if it could defeat the reasonable expectations of their negotiating adversaries, simply by convincing the court that the contract is susceptible to more than one interpretation. Why should it get to escape the consequences of a negotiating history that it helped to shape?

Under an approach that takes these factors into account, the rule of construction in favor of franchise rights would apply differently to mutually negotiated contracts. Before applying the rule of construction to an ambiguous contract, the court would consider all relevant extrinsic evidence. It would then interpret the contract in the manner that is the least re-

**39.** *Durkin v. Nat'l Bank of Olyphant,* 772 F.2d 55, 59 (3d Cir.1985), *cited with approval in Hubbard,* 1991 WL at *5–6, 1991 Del. Ch. Lexis at *18–19; *see also PL Capital, LLC v. Bonaventura,* Del.Ch., C.A. No. 19068, tr. at 27, Noble, V.C. (Sept. 28, 2001) ("Shareholders don't run the company. Under Section 141, the directors do. Thus, for an ongoing corporate venture, the election of directors may be the most ... important action[] that shareholders can take. And without a choice of candidates, there can be no election or exercise of that franchise.").

strictive of electoral rights, unless it is convinced by the extrinsic evidence that the more restrictive reading was clearly intended by the parties. Put otherwise, there should be clear and convincing evidence in support of the restriction on electoral rights. This is akin to the burden that is said to be required to obtain specific performance of an oral contract.[40]

The existing precedent does not definitively answer the question as to which alternative I should adopt, but the better reading of the cases supports the more flexible of the two standards. Although prior opinions state the view that restrictions on fundamental electoral rights should not be enforced unless the contractual language is "clear and unambiguous," these cases are hard to read as cutting off a review of extrinsic evidence in cases like this one. For one thing, several of these cases involved situations in which the courts in fact reviewed the extrinsic evidence of arms-length negotiations before making their contractual interpretations.[41] Indeed, the very fact that the courts looked at the extrinsic evidence in these cases involving negotiated corporate instruments suggests that they were using the rule of construction as a deadlock

---

**40.** *See, e.g., Shuttleworth v. Abramo,* 1992 WL 25756, at *1, 1992 Del. Ch. Lexix 40, at *4 (Del.Ch.); *Hudson v. Layton,* 5 Harr. (Del.) 74, 87 (1848). The clear and convincing evidentiary standard is "an intermediate evidentiary standard, higher than mere preponderance, but lower than proof beyond a reasonable doubt"; it has also been described as requiring "evidence which produces in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions are 'highly probable.'" *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.,* 794 A.2d 1141, 1151 (Del.2002) (quoting *In re Tavel,* 661 A.2d 1061, 1070 n. 5 (Del.1995) & *In re Rowe,* 566 A.2d 1001, 1003 (Del.Jud. 1989), respectively).

**41.** There are at least three opinions of the type just described: namely, those in which our courts have stated – after carefully reviewing the extrinsic evidence – that restrictions on electoral rights could not be upheld unless they were unambiguous.

One of these decisions was written by me. In *Rohe,* 2000 WL 1038190, 2000 Del. Ch. Lexis 108, it was contended that corporate instruments limited the ability of certain stockholders to use their voting power to remove sitting directors. Those stockholders had participated in the negotiations, which resulted in "ambiguous and arguably discordant instruments, whose terms hardly leave the court a clear sense of what the parties intended to accomplish." *Id.* at *1, 2000 Del. Ch. Lexis at *2. Nevertheless, I did not resolve the ambiguity simply by reading the contract in favor of the stockholders' right to vote for removal. Instead, I considered all the extrinsic evidence relevant to the issue, and only after doing so, gave weight to the rule of construction. *Id.* at *11, 2000 Del. Ch. Lexis at *40.

Likewise, in *Feste,* 2002 WL 244859, 2002 Del. Ch. Lexis 8 (Del.Ch.), the court held a trial precisely because it could not conclude, at the summary judgment stage, that there were no material issues of fact related to the construction of a negotiated stockholders' agreement that arguably restricted the right of a majority of the shares from voting for more than three members of a seven-member board. *Id.* at *5, 2002 Del. Ch. Lexis at *15. Although Vice Chancellor Lamb ultimately found that the agreement's terms were unambiguous and did not support the restriction, he also reviewed the parol evidence in the trial record carefully and noted that it could not buttress a conclusion that the parties intended the restriction. *Id.* at *6–7, 2002 Del. Ch. Lexis at *21–24. The court's approach is therefore, on balance, consistent with the application of the rule of construction after the consideration of the parol evidence.

The same is true of the case of *Rainbow Navigation,* 1989 WL 40805, 1989 Del. Ch. Lexis 41 (Del.Ch.). In that case, the court reviewed a stockholders' agreement that had the arguable effect of precluding a majority of the shareholders from electing a new board majority. Although the court ultimately found that the agreement's plain terms were to the contrary, the court also reviewed the extrinsic evidence and found that evidence inconsistent with a restrictive intent. *Id.* at *2–3, 1989 Del. Ch. Lexis at *7.

breaker that applied after – and not before – a full review of that evidence. The other prior cases are also inconclusive because they dealt with a different policy context: namely, situations in which the party whose electoral rights were arguably restricted had played no role in crafting the corporate instruments.[42]

 Because the prior precedent is inconclusive, it is incumbent upon me to choose the approach that commends itself as most efficient and fair. Of the two competing approaches, I conclude that the one that enables the court to hear the extrinsic evidence and to apply the rule of construction thereafter best advances the relevant public interests at stake. By permitting the court to consider the parol evidence regarding a negotiated corporate instrument, this approach advances the central aim of contract interpretation, which is to "preserve to the extent feasible the expectations that form the basis of a contractual relationship."[43] In the event of ambiguity in a heavily negotiated contract, it is generally "the most reasonable meaning of the words used, when interpreted in the particular setting, including

the course of negotiation and relevant commercial practices, to which courts look in order to define contractual rights and duties."[44] This general rule recognizes human imperfection, which creates an ever-present risk that even talented negotiators may fail to spell out their intentions unambiguously. We risk too much potential inequity to adopt an alternative that ignores this reality, because it would permit a sophisticated party to exploit ambiguities in contracts to extract a better bargain for itself after the fact, knowing that the court would have to remain blind to parol evidence that would make untenable its view of the contract.[45]

At the same time, of course, it is important to give substantial weight to the important public policy interest against disenfranchisement. But this interest can be sufficiently furthered by requiring any restriction impinging upon fundamental electoral rights to be manifested in clear and convincing evidence. So long as this sort of clarity is required, there is less danger that an erroneous and therefore inequitable deprivation of core electoral rights will occur.

42. See, e.g., Centaur Partners, IV v. Nat'l Intergroup, Inc., 582 A.2d 923 (Del.1990); Comac Partners, L.P. v. Ghaznavi, 793 A.2d 372 (Del. Ch.2001); Stengel v. Rotman, 2001 WL 221512, 2001 Del. Ch. Lexis 22 (Del.Ch.); Standard Power & Light Corp. v. Inv. Assocs., Inc., 51 A.2d 572 (Del.1947).

43. Eagle Indus. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1233 (Del.1997).

44. Rainbow Navigation v. Yonge, 1989 WL 40805 at *5, 1989 Del. Ch. Lexis 41, at *14 (Del.Ch.).

45. It is worth noting that a shift in the rules of contract interpretation in Delaware provides another interesting gloss on the case law. In the Centaur case, the Supreme Court held that an ambiguous charter provision should be interpreted in the manner that did

not result in disenfranchisement. 582 A.2d at 928. It also stated, however, that:

> In the interpretation of charter and by-law provisions, 'courts must give effect to the intent of the parties as revealed by the language of the certificate and the circumstances creating its creation and adoption.' ... Therefore, the intent of the stockholders in enacting particular charter or by-law amendments is instructive in determining whether any ambiguity exists.

582 A.2d at 928 (internal citations omitted). Since Centaur was decided, the Supreme Court issued a strong opinion sharply limiting the extent to which courts could consider extrinsic evidence in determining the plain meaning of a contract. Eagle Indus., 702 A.2d at 1232–33 & n. 7. In particular, the Court held that extrinsic evidence could not be used to "create an ambiguity." Id. at 1232.

As a result, I will take the following approach in interpreting the JCC's charter and bylaws. Initially, I will consider whether the contract is plain on its face. If I conclude that it is ambiguous, I will then evaluate the extrinsic evidence. At that stage, however, I must rule against JCC unless the evidence clearly and convincingly supports the conclusion that the usual right Harrah's would have to nominate more than one candidate was limited by the charter and bylaws.

### III.

### A.

The language of the JCC charter and bylaws is the most important evidence of the parties' intent. On balance, I conclude that the language is ambiguous with respect to the question of whether Harrah's may nominate more than one director at the First Anniversary Meeting, but that the better reading is the one advanced by Harrah's.

■■■ In so concluding, several features of the texts are important. Initially, it is worth noting that the language that JCC relies upon as a limitation on Harrah's ability to nominate more than one director is phrased in terms that are uncharacteristic of a restriction. By its plain terms, the Specific Nomination Provision gives Harrah's and the Noteholder Directors the "right" to nominate one director apiece at the First Anniversary Meeting. Not only is this right phrased positively, it is not modified by a restrictive term, such as the right to nominate "only," "exclusively," or "solely" one director. Other text in the new JCC charter use such words of restriction, and so does language in the prior JCC charter.

It is, of course, true as JCC says that the drafters of the charter were also familiar with the words "one or more" and could have used those words to more clearly express the fact that Harrah's nomination rights were unrestricted. But the fact that Harrah's was given the right to nominate only one candidate under the highly favorable terms of the Specific Nomination Provision does not necessarily mean that it was prevented from nominating additional candidates under the more restrictive General Nomination Provision. Although courts must be careful to acknowledge the inability of scriveners of complicated corporate instruments to draft perfectly clear documents, the absence of obvious words of restriction in the Specific Nomination Provision on the whole cuts against interpreting that section as restricting Harrah's nomination rights.

Also weighing against JCC's interpretation is the odd nature of the supposed contractual method the Noteholders used to retain control. JCC admits that the Noteholders' first idea for maintaining control – placing all of their directors in the rear class – was a much simpler, and more typical, method to accomplish their aims. Likewise, it is common for accords about board control to be cemented by voting agreements.

The absence of a voting agreement is especially important here because of the asymmetry that exists in the Specific Nomination Provision. JCC says that the Provision was intended to maintain four directors for the Noteholders for three years, and three directors for Harrah's. By its own terms, however, the Specific Nomination Provision does not address the right of individual Noteholders – who were receiving common stock in the reorganization – to nominate directors. Instead, it deals only with the nomination rights of the Noteholder Directors. By contrast, the nomination rights of Harrah's itself are covered by the Specific Nomination Provi-

sion, and not the nomination rights of the Harrah's Directors.

Under JCC's interpretation, this asymmetry left Harrah's uniquely vulnerable. In JCC's view, Harrah's cannot exercise nomination rights under the General Nomination Provision because the Specific Nomination Provision supposedly limits it to one nominee. That same limitation also applies to the Noteholder Directors themselves. But the problem is that this limitation is toothless, because any Noteholder-stockholder is free to nominate two candidates under the General Nomination Provision. Because the Noteholders and Banker's Trust owned 51% of the stock as of the reorganization, this scenario posed the threat that Harrah's would have to fight at the First and Second Anniversary Meetings simply to keep its contingent of three board members at full strength, and risked having its representation reduced to one by the Second Meeting. That is, under JCC's interpretation, Harrah's could not gain board seats, but could lose them, at the First and Second Anniversary Meetings. It is improbable that Harrah's agreed to accept this one-sided risk, and more probable that the parties accepted the risk that changes in share ownership could tilt the board in either direction at the First and Second Anniversary Meetings. This inference is reinforced by the substantial advantage the Noteholders already had as a result of the presence of three of their directors in the two rear classes created by the charter – an advantage that already ensured the Noteholders three directors for two years, and two directors for three years.

If JCC's response to this scenario is that Harrah's was free to sell one share of its stock to a third party in exchange for that party's agreement to nominate a director, its retort tends to undermine its reading for another reason. Because the restric-

tion on Harrah's practical ability to obtain board control would be so insubstantial, it becomes more difficult to read the Specific Nomination Provision as intended for that purpose. JCC, however, raises the possibility that the implied covenant of good faith and fair dealing would cut off Harrah's option to take this tack. Of course, resort to this argument takes JCC even further away from reliance on specific contractual language, and makes stricter a "limitation" already phrased in the unusual nomenclature of an affirmative "right."

Stated summarily, the lack of clarity that arises from these scenarios render JCC's interpretation less plausible, because a reasonable negotiator reading the Specific Nomination Provision would not be apt to view it as a sensible method of regulating control of the board. That parties would eschew clearer, more effective, and more typical methods for regulating board composition in favor of a nomination right that was implicitly intended to act as a limitation is a difficult proposition to accept.

This is made more so by the fact that the affirmative right to nominate directors accorded by the Specific Nomination Provision has independent meaning, even under Harrah's construction. Absent the Specific Nomination Provision, the following situation could have arisen. After the deadline for stockholder nominations of directors under the General Nomination Provision, suppose the existing JCC board majority comprised of Noteholder Directors decided to nominate as the management slate two candidates affiliated with the Noteholders, and not to renominate the Harrah's Director whose seat was up for election. In that circumstance, Harrah's would have been out of luck absent the right set forth in the Specific Nomination Provision. Because of the Specific Nomination Provision, however,

Harrah's could have nominated its nominee-incumbent as a candidate at the First Anniversary Meeting irrespective of whether the advance nomination deadline in the General Nomination Provision of the by laws had passed and irrespective of whether he had been left off the JCC management slate. At the Second Anniversary Meeting, this same right of the Noteholder Directors operates to protect them if a new board majority chooses not to nominate the Noteholder Director whose seat is up for election.

These nomination rights also have utility because it is possible that the balance of ownership in JCC will change during the three years after the reorganization. This could occur in more than one way. Harrah's, for example, might alienate some of its shares, opening the door to potential election victory for the Noteholders and Banker's Trust – or an entity that purchased some substantial amount of their shares. In this scenario, it is conceivable that a proxy contest by a new equity holder might be mounted and/or that the outcome of an election contest at the First or Second Anniversary Meetings between a Harrah's nominee and a Noteholder nominee could be doubtful. Given this possibility, the nomination rights set forth in the Specific Nomination Provision could be useful, because it would guarantee Harrah's and the Noteholders the right to nominate at least one candidate each, in reaction to last-minute nominations made under the General Nomination Provision or by the JCC board. Put bluntly, JCC's argument that Harrah's reading of Specific Nomination Provision renders the nomination language of that section meaningless lacks force.

That said, I acknowledge that there are features of the text that make JCC's interpretation a plausible, if highly unusual, one. Because the Specific Nomination Provision applies only at the First and Second Anniversary Meetings, reading the rights granted therein as a limitation has some intuitive appeal, because doing so tends to lock in the original board split until the Third Anniversary Meeting.

Furthermore, the "subject to" language in the General Nomination Provision improves the plausibility of JCC's reading. That introductory language can be seen as subjecting any rights in the General Nomination Provision to any limitations contained in the Specific Nomination Provision. This reading, of course, depends critically on whether the Specific Nomination Provision "right" is in fact a limitation, a question that the qualifying words "subject to" do not help to answer.

In this regard, however, it is critical that the "subject to" reference is more reasonably read as expressing the idea that the limitation on a stockholder's ability to nominate directors after the deadline set forth in the General Nomination Provision was without standing as to nominations made by Harrah's and the Noteholder Directors under the unqualified affirmative right set forth in the Specific Nomination Provision. This reading subordinates the General Nomination Provision to the Specific Nomination Provision, as JCC contends must be done, but in a way that does not deprive either Harrah's or the Noteholder Directors of rights they otherwise possess as JCC stockholders. The reasonableness of this view of the purpose of the "subject to" language is buttressed by other terms of the General Nomination Provision, which otherwise explicitly require the disqualification of candidates not nominated in accordance with its terms.

After weighing all of these textual considerations, I conclude that the charter and the bylaws are better read as permitting Harrah's to nominate more than one director at the First Anniversary Meeting, so long as its second nominee is nominated

in compliance with the General Nomination Provision. This reading gives meaning to all the terms of the charter and bylaws, and is most consistent with the explicit characterization of the Specific Nomination Provision as a right rather than a limitation.

### B.

■ Because JCC's interpretation of the instruments is a plausible, if second-best, one, I must consider the extrinsic evidence. As noted earlier, JCC's reading has the effect of restricting Harrah's from exercising fundamental electoral rights. Therefore, it can only prevail if the extrinsic evidence clearly and convincingly persuades me that the negotiating parties intended to restrict Harrah's nomination rights under the General Nomination Provision. This is an intentionally "heavy burden" that reflects our public policy in favor of competitive corporate elections.[46]

The extrinsic evidence is inadequate for this purpose, and fails to overcome the better reading that emerges from a reading of the instruments' text. This is perhaps unsurprising in view of the failure of either JCC or Harrah's to call as a trial witness the key lawyers who negotiated the final terms of the charter and bylaws for Harrah's, the Noteholders, and Banker's Trust. Both parties also routinely invoked the attorney-client privilege, thereby insulating further probative evidence from judicial review.

This leaves a record that is anything but clear on the subjective intent of the parties regarding the relevant language of the charter and bylaws. Doubtless, there is evidence in the negotiating record that supports JCC's position and that suggests that the Noteholders intended the Specific Nomination Provision to act as a limitation on Harrah's rights under the General Nomination Provisions.

But there is also evidence in the record that support Harrah's contrary interpretation. The forthright board-control discussions leading up to the MOU weigh in favor of Harrah's reading, because they suggest that later drafts of the charter and bylaws would have been more explicit about giving back to the Noteholders by another means a demand they had earlier forsaken (*i.e.*, their request to place their nominees all in the rear class and thereby ensure their service for three years). In this same vein, it also tends to undermine JCC's position that no witness for JCC can recall when or why it was that Harrah's ultimately relented on the board control issue in March 2001, despite its adamant opposition to yielding control of the board to the Noteholders for three years in January 2001.

Even more important is the fact that none of the public filings relating to the reorganization contain a statement indicating or implying in any way that Harrah's was precluded from nominating more than one director at each of the First and Second Anniversary Meetings. A limitation of such importance would have been material and worthy of note – indeed, of emphasis. Likewise, one would think that the Noteholders' supposed bargaining victory would have been described unambiguously in some contemporaneous writing – such as a meeting note, JCC board minutes, or one of Hardie's memoranda to the Noteholders – but there is no writing of this kind in the record.

■ At best, JCC can point to evidence that supports an inference that the Noteholders were able to insert language into the proposed JCC charter and bylaws that gave them room to later argue that Harrah's nomination rights were limited. What the evidence does not support is a

**46.** *McIlquham v. Feste,* 2002 WL 244859, at *5, 6, 2002 Del. Ch. Lexis 8, at *17 (Del.Ch.).

finding that the Noteholder negotiators *unmistakably* informed the Harrah's negotiators that the Specific Nomination Provision was intended to restrict Harrah's ability to nominate more than one director at the First and Second Anniversary Meetings under the General Nomination Provision. No document to that effect exists. And no witness from the defendants has testified to having heard the Noteholders' negotiators utter a clear statement of this kind to Harrah's.

Indeed, the inference I draw from the record is that the Noteholders' negotiators knew that they could not get Harrah's to agree to a clear agreement on Noteholder board control for three years. If the Noteholders had put back on the table an explicit demand that the Noteholder nominees all occupy the rear class of the classified board, they knew that Harrah's would have accused them of retrading the deal in the MOU and refused to go along. The Noteholders also knew that Harrah's would refuse to enter into a voting agreement guaranteeing Noteholder control for three years.

For that reason, the Noteholders adopted a more implicit negotiation style. But having chosen a more *sotto voce* approach to obtaining what they wanted, the Noteholders left themselves dependent on the clarity of the final language of the charter and bylaws to accomplish that objective. Stated differently, I cannot conclude that Harrah's clearly knew or had clear reason to know of the Noteholders' belief that the Specific Nomination Provision restricted Harrah's nomination rights under the General Nomination Provision.[47] Because the Specific Nomination Provision does not clearly limit Harrah's electoral rights,[48] the residual doubt I harbor must be resolved in favor of permitting Harrah's to exercise the electoral rights it ordinarily would possess as a JCC stockholder.[49]

IV.

For the foregoing reasons, a final judgment shall be entered in favor of Harrah's requiring JCC to accept both of the nominations submitted by Harrah's for the upcoming annual meeting. A conforming order shall be submitted within the business day.

---

47. *See U.S. West, Inc. v. Time Warner, Inc.,* 1996 WL 307445, at *10, 1996 Del. Ch. Lexis 55, at *33 (Del.Ch.) ("Only an objectively reasonable interpretation that is in fact held by one side of the negotiation and which the other side knew or had reason to know that the first party held can be enforced as a contractual duty.").

48. *See* Hiestand Dep. at 122–23 (indicating that the language in the Specific Nomination Provision "could be made more clear").

49. *See, e.g., Feste,* 2002 WL 244859, at *5, 6, 2002 Del. Ch. Lexis 8, at *17; *Rohe v. Reliance Training Network, Inc.,* 2000 WL 1038190, at *15, 16 (Del.Ch.); *Rainbow Navigation, Inc. v. Yonge,* 1989 WL 40805, at *4, 1989 Del. Ch. Lexis 41, at *12 (Del.Ch.).